# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MACKENZY NOZE and JONAS JOSEPH,<br>*Defendants*. | No. 3:16-cr-100 (JAM) |

## ORDER GRANTING MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY RE CREDIBILITY OF COOPERATING WITNESSES

The United States has charged defendants Mackenzy Noze and Jonas Joseph with fraud arising from the staging of fake car crashes for the purpose of wrongfully collecting insurance benefits. The Government has called at trial two so-called "cooperating witnesses," *i.e*, alleged co-conspirators of the defendants who have pleaded guilty and who are "cooperating" with the Government by testifying at trial in hopes of receiving a sentence reduction.

In light of the Government's reliance on cooperating witnesses, defendants propose to call an expert, Professor Robert Bloom of Boston College Law School, to testify "regarding the credibility of cooperating witnesses." Doc. #228 at 1. Professor Bloom is the author of a book, *Ratting: The Use and Abuse of Informants in the American Justice System*. According to defendants, Professor Bloom "will not testify about the credibility of any of the particular witnesses in this case," but his "testimony will be limited to testifying about the system itself and the incentives and the benefits cooperating witnesses receive for testifying." *Id.* at 2. He would "also testify about research and studies concerning the credibility in general of informants." *Ibid*. The Government has moved *in limine* to preclude the proposed testimony. Doc. #223.

I will grant the Government's motion. As the Second Circuit has noted, "[i]t is a well-recognized principle of our trial system that determining the weight and credibility of a witness's

testimony belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). For that reason, "expert opinions that constitute evaluations of witness credibility" are precluded under Fed. R. Evid. 702, even when "rooted in scientific or technical expertise." *Id.* at 398.

In *Nimely*, the Second Circuit concluded that it was not proper for an expert to testify about the credibility of police officers. "Even assuming that [the expert], based upon his experience or expertise, was qualified to render an opinion as to the tendencies of police officers to lie or to tell the truth in investigations of the sort at issue here (an assumption of which we are highly dubious), his statements essentially instructed the jury as to an ultimate determination that was exclusively within its province, namely, the credibility of [the police officers]." 414 F.3d at 398. The Second Circuit concluded that this was improper under Fed. R. Evid. 702 and equally so under Fed. R. Evid. 403. *Ibid.*

Although defendants strive to distinguish *Nimely* on its facts, I need not compare the facts of *Nimely* to the facts of this case, because the rationale set forth by the Second Circuit could not be clearer: that the Federal Rules of Evidence do not allow one party to call an expert to opine about the tendencies or incentives of the other party's fact witnesses to lie or not to lie. It is for the jury to decide if witnesses are lying.

More recently, in *United States v. Allen*, 716 F.3d 98 (4th Cir. 2013), the Fourth Circuit relied on *Nimely* to affirm a district court's decision precluding an expert criminal defense attorney from testifying about "the legal significance of § 5K1.1 letters, § 3553(e) motions, and 21 U.S.C. § 851 notices—all of which entail the government asking for a lesser sentence in light of a defendant's substantial cooperation—in order to show that the codefendants called to testify against him may be biased." *Id.* at 105. The Fourth Circuit observed that "[a] juror can connect

the dots and understand the implications that a plea agreement might have on a codefendant's testimony—'it is certainly within the realm of common sense that certain witnesses would have an incentive to incriminate the defendant in exchange for a lower sentence.'" *Id.* at 106 (quoting *United States v. French*, 12 F.3d 114, 117 (8th Cir.1993)). Accordingly, the Fourth Circuit concluded that "[t]his is not an issue of fact that would be better explained by an expert." *Ibid.*

I agree. Defense counsel at trial have ample opportunity to impeach any cooperating witnesses about their own criminal acts and about their self-interested motives for testifying and any benefits that they may expect to receive. Prosecutors have a constitutional duty to disclose material impeachment information, including any benefits promised to a cooperating witness in relation to his or her testimony. Indeed, it is standard practice in federal criminal cases for the prosecution to enter into a written cooperation agreement that memorializes the potential benefits that may ensue as a result of a cooperating witness's testimony.

Moreover, the Court will issue a standard jury instruction cautioning jurors that they must view the testimony of a cooperating witness with particular caution and great care in deciding whether and how much (if any) of a cooperating witness's testimony to believe. Defendants are invited to suggest additions to this standard instruction if there are additional advisories that would make clearer to the jury how careful it must be with respect to evaluating the testimony of a cooperating witness.

Defendants principally rely on *State v. Leniart*, 166 Conn. App. 142, 223 (2016), *cert. granted* 323 Conn. 918 (2016), in which the Connecticut Appellate Court overturned the decision of a trial court to preclude expert testimony by a law school professor about the general unreliability of jailhouse informants. The *Leniart* decision is plainly contrary to the Second Circuit's ruling in *Nimely*, and its reasoning is not persuasive.

3

For example, the *Leniart* court concluded that a law professor may teach the jury about "the true culture of jails." 166 Conn. App. at 224. But I think juries already understand that jails are miserable places. Juries understand that cooperating witnesses have committed crimes and have powerful motives to say what they can to stay out of or to be released from jail. I am not convinced that juries need a law professor to teach them more about the "true culture of jails."

Nor am I convinced that jurors need a law professor to explain "the full extent to which informants could benefit in our criminal justice system." *Ibid.* In federal cases, the actual and potential benefits for a cooperating witness are ordinarily spelled out in a written and disclosed cooperation agreement between the witness and the Government. For that matter, prosecutors are required by the Constitution to disclose the benefits that their witnesses will or stand to receive as a result of their cooperation. Defense counsel are well-experienced with cross-examination to highlight these benefits and what the cooperating witness stands to gain. I am not convinced that juries need a law professor to speculate that a witness may in fact receive more benefits than what a cooperation agreement says or to suggest *sub silentio* that a prosecutor has been derelict in his or her disclosure duties under the Constitution.

In addition, the court in *Leniart* reasoned that "[a]s long as the expert does not directly opine about a particular witness's credibility," then "expert testimony nevertheless is admissible if it can provide a jury with generalized information or behavioral observations that are outside the knowledge of an average juror and that would assist it in assessing a particular witness' credibility." *Id.* at 223. This distinction between the general and the particular is not convincing. It no less invades the province of the jury for a law professor to opine that cooperators in general are liars than to opine that a particular cooperating witness is a liar. The inference sought to be drawn from the testimony is the same: that a cooperating witness is lying.

If criminal defendants are free to enlist law professors to assail the truthfulness of cooperating witnesses, it is hard to understand why prosecutors should not have an equal right to call their own rebuttal experts. Prosecutors could no doubt find expert law enforcement professionals to attest how often the information received from cooperating witnesses turns out in hindsight to be entirely true (as so often indisputably corroborated by undercover tape recordings and subsequent seizures of evidence) and no less vital to the solving of serious crimes. It would not be long before criminal trials would devolve from a focus on the actual evidence to battles of road-show experts for the defense and the prosecution about the tendencies and truthfulness of cooperating witnesses.

The possibility that cooperating witnesses may lie presents a continuing challenge for the criminal justice system. But the relevant issue here and now is whether the remedy should be to open the floodgates for expert testimony that cooperating witnesses are liars. I do not think so.[1]

## CONCLUSION

The Government's motion *in limine* to preclude expert testimony (Doc. #223) is GRANTED.

It is so ordered.

Dated at New Haven, Connecticut, this 7th day of June 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[1] A stronger argument may be made for expert testimony concerning the risk of mistakes in eyewitness identification testimony. *See, e.g.*, *State v. Guilbert*, 306 Conn. 218 (2012); *Smith v. Smith*, 2003 WL 22290984 (S.D.N.Y. 2003); *see also Young v. Conway*, 698 F.3d 69, 80–83 (2d Cir. 2012) (discussing risks of misidentification). That type of testimony is not offered to demonstrate that a witness is lying but rather to explain scientific limitations on human perceptual capacity that may be commonly misunderstood by the general public.

5