UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:16CR100(JAM) |
| v. | : | |
| | : | |
| MACKENZY NOZE | : | September 19, 2017 |

## Sentencing Memorandum

The defendant, Mackenzy Noze, was the ringleader of an extensive, multiyear fraud scheme that involved staging car crashes in order to collect on bogus insurance claims. Mr. Noze personally was involved in as many as 50 staged crashes with an estimated corresponding loss amount of $600,000. The trial evidence also showed that he engaged others to join his scheme and attempted to avoid detection by law enforcement and the victim insurers. Given the seriousness of the offense and Mr. Noze's leadership role in the charged conspiracy, the Government respectfully submits that a sentence within the applicable Sentencing Guidelines range of 70 to 87 months of imprisonment is appropriate.

### I.  Factual Background

The facts underlying Mr. Noze's conviction are set out accurately in the presentence report ("PSR"), and adopted by the Government.

Mr. Noze orchestrated a long-running scheme to deliberately stage car crashes in and around New London County for the purpose of defrauding automobile insurance companies. *See* PSR ¶ 10. The trial evidence showed that Mr. Noze planned and had the lead role in executing the scheme, enlisted others to participate, coached

1

his co-conspirators through the claim process, and directed others to pay him part of their ill-gotten insurance payouts. *Id.* ¶ 16. As reflected in the chart in the PSR, the scheme involved more than 15 participants. *Id.* ¶ 18.

Many of the planned crashes were single-vehicle accidents on remote roads where there were no witnesses other than the participants. *Id.* ¶ 11. Typically, Mr. Noze would purposely drive into a tree or other stationary object. *Id.* In some instances, Mr. Noze then would leave the scene before law enforcement officers arrived, and his co-conspirators would enter the crashed vehicle, with one falsely claiming to have been the driver. *Id.* In other instances, Mr. Noze would remain on scene but another participant would falsely claim to have been the driver. *Id.* This deception limited the number of crashes in which the police listed Mr. Noze as the driver, thus concealing his role from insurers and law enforcement. *Id.*

After the crash, the participants would file fraudulent insurance claims. *Id.* ¶ 12. The participants would make various false representations to the victim insurance companies through interstate telephone calls, facsimiles, emails, and mailings regarding (a) the conditions that caused the crash; (b) the identity of the driver of the vehicle at the time of the crash; (c) whether the purported passengers actually were inside the car at the time of the crash; and (d) whether and to what extent the occupants of the vehicle suffered injuries as a result of the crash. *Id.* The participants then would collect payouts on the fraudulent claims from the victim insurers. *Id.*

When Mr. Noze left the scene before law enforcement arrived (and thus was not listed on the police report), he did not personally file an insurance claim. *Id.* ¶ 13. In these instances, he received a cut of his co-conspirators' insurance payouts. *Id.* When Mr. Noze remained on scene after a staged crash, he both filed a fraudulent insurance claim in his own name and received a cut of his co-conspirators' payouts. *Id.*

Mr. Noze was personally involved in 40 to 50 staged crashes. *Id.* ¶ 14. The Government introduced evidence at trial of 11 of these crashes, which are reflected in the chart in the PSR. *Id.* ¶ 18. Two additional crashes (denoted by an asterisk) also are included in the chart. One of these additions (the December 7, 2012 crash) actually was not a staged crash but a "crime of opportunity." *Id.* ¶ 14. Mr. Noze was involved in a real two-car accident. *Id.* He took advantage of the opportunity by falsely claiming to be injured and submitting a fraudulent bodily injury claim to the victim insurance company. *Id.* The other new addition (the September 25, 2013 crash) involved a U-Haul rental truck that Mr. Noze purposely crashed into the stationary car of another co-conspirator, Jonas Joseph. *Id.* A third co-conspirator, Pierre Jeudy, then claimed to have been the driver. *Id.*

The total intended loss amount associated with the 13 crashes in the chart is $214,301.15. *Id.* ¶¶ 15, 18. The total actual loss is $207,083.36. *Id.* Because these 13 crashes reflect only about one-third of the incidents in which Mr. Noze was involved, it is reasonable to estimate conservatively the total loss at approximately $600,000. *See* U.S.S.G. § 2B1.1, comment. (n. 3(C)).

After the first few staged crashes, Mr. Noze and his co-conspirators stopped hiring lawyers to pursue their claims. PSR ¶ 17. According to one of Mr. Noze's co-conspirators, Carlins Calixte, Mr. Noze made this decision because, if a lawyer was involved, it was more likely that the State of Connecticut would learn about the settlement and place a lien on the proceeds due to Mr. Noze's outstanding child support obligations. *Id.* According to another co-conspirator, Jennifer Lewis, who dated and lived with Mr. Noze for more than two years, staging car crashes was Mr. Noze's primary source of income. *Id.* During the period that Mr. Noze and Ms. Lewis were together, the only job Mr. Noze held was digging pools for one summer. *Id.*

## II. Sentencing Guidelines

The Government agrees with the Sentencing Guidelines calculation in the PSR, resulting in total offense level of 25, a criminal history category of III, and a resulting Guidelines imprisonment range of 70 to 87 months. *See id.* ¶¶ 24-32, 38, 83.

The Government is not seeking an enhancement for obstruction of justice. *See id.* ¶¶ 20-21. Despite doubts about the legitimacy and extent of Mr. Noze's claimed mental health issues, the Government is not in position to prove by a preponderance of the evidence that Mr. Noze misled the Court about his mental health status in an effort to avoid prosecution.

## III. Discussion

Mr. Noze led a fraud ring that stole hundreds of thousands of dollars from insurance companies. He scouted out and selected the crash locations, schooled his co-conspirators in the mechanics of the fraud, and persuaded others—including Ms.

Lewis and her daughter—to join the scheme.[1] Mr. Noze was in a staggering number of staged crashes—between 40 and 50, according to Mr. Calixte. His crime spanned at least three years (March 2011 through February 2014), and likely much longer. Indeed, Mr. Calixte testified at trial that Mr. Noze began staging car crashes shortly after moving back to Connecticut from Florida, which was in approximately 2007. *See* PSR ¶45.

Although the scheme targeted insurers, it also impacted law enforcement and medical professionals. Police officers, and sometimes ambulances, had to respond to the staged crashes. When Mr. Noze and his co-conspirators feigned injury, doctors and nurses had to spend time spent time examining and treating non-existent injuries.

There was a brazenness to Mr. Noze's crime, which also informs the question of the seriousness of the offense. The sheer number of staged crashes speaks for itself.

---

[1] Mr. Noze objects to any role enhancement. *See* Def.'s Sen. Mem. at 2-3. A four-point enhancement is applicable "[i]f the defendant was an organizer or leader of a criminal activity that involve five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Mr. Noze does not contest that the scheme involved five or more participants. Hence, the only question is what role Mr. Noze played with respect to those other participants. In making this determination, the Guidelines direct courts to consider, among other factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.*, comment. (n. 4). The Government respectfully submits that nearly all of those factors are present here: Mr. Noze selected the crash locations, chose the days on which crashes would be staged, drove the crashed vehicles, recruited others (including Ms. Lewis and her daughter), took cuts of other participants' insurance payouts, and coached others through the claims process. Although Mr. Noze claims that there were others "who were prolific in acting on their own, without Mr. Noze," Def.'s Sen. Mem. at 3, there were no other participants who were involved in nearly as many crashes as Mr. Noze. Moreover, even assuming *arguendo* that some other participant also qualified for a role enhancement (which the Government has not argued and does not intend to argue in any of the related cases), that others also played a leadership role is not dispositive as to whether Mr. Noze did. *See United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004).

But Mr. Noze also (generally) stuck to a tried-and-true pattern: a single-vehicle crash on a rural road, often late at night, with the car purportedly swerving to avoid an animal or losing control due to weather conditions and then striking a tree. Many of the crashes occurred on the same exact stretches of road (*e.g.*, Mohegan Park in Norwich). Many also exploited freshly opened insurance policies. And of course, the true hallmark of the scheme was bald-faced deception as the conspirators lied to the responding police officers; the ambulance drivers and tow truck operators; the doctors and nurses; and the victim insurers.

Mr. Noze exerted considerable effort to avoid being caught. He chose remote crash sites to minimize the possibility of witnesses. He often left the scene before law enforcement arrived and alternated which of his co-conspirators would pose as the driver. And he frequently switched insurers between crashes (or, if the policy was not in his name, had his co-conspirators do so). When he finally was apprehended, Mr. Noze refused to accept responsibility.

It is true that Mr. Noze had a difficult childhood in Haiti, s*ee id.* ¶¶ 43, 48, and has struggled with alcohol and drug abuse as an adult, *id.* ¶¶ 57-58. Those are both factors the Court should consider in assessing his history and characteristics. *See* 18 U.S.C. § 3553(a)(1). So, too, should the Court take note of Mr. Noze's overall compliance with the terms of his pretrial release in this case. *See* PSR ¶ 101. But there are other personal characteristics that cut the other way, including Mr. Noze's

6

checkered employment record, *see id.* ¶¶ 67-77, 79,[2] his fathering of five children by four women, *see id.* ¶ 53, and his neglect in providing for those children, *see id.* ¶ 79. In the Government's view, none of these factors removes this case from the Guidelines (either upward or downward).

In addition to reflecting the seriousness of the offense, *see* 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence also will promote respect for the law and deter others from similar offenses, *see id.* § 3553(a)(2)(B). Automobile insurance fraud is difficult to detect. Neither police officers nor insurers ordinarily have the tools or capacity to flag suspicious patterns across multiple crashes involving different parties. Hence, when a fraudster *is* prosecuted, it is important to send a strong message that this type of crime will be punished appropriately.

## IV.     Restitution

Restitution is mandatory under 18 U.S.C. § 3663A in the amount of $207,083.36. *See* PSR ¶ 91. Mr. Noze is jointly and severally liable with his co-defendants as set forth in the PSR. *See id.* ¶ 18.

## V.      Conclusion

Based on the foregoing, and to reflect, *inter alia*, the seriousness of the offense, the need to deter others, and the need to provide restitution, the Government

---

[2] The defendant characterizes his employment record as "exceptional." *See* Def.'s Sentencing Mem. at 2. But the PSR reflects a great deal of movement between short-term jobs, Ms. Lewis recalled that Mr. Noze only worked for a single summer during their two-year relationship, and the State of Connecticut Department of Labor has no records for Mr. Noze.

respectfully that the Court impose a Guidelines sentence and order Mr. Noze to pay restitution in the amount of $207,083.36.

        Respectfully submitted,

        DEIRDRE M. DALY
        UNITED STATES ATTORNEY

        AVI M. PERRY
        ASSISTANT UNITED STATES ATTORNEY
        United States Attorney's Office
        157 Church Street, 25th Floor
        New Haven, CT 06510
        avi.m.perry@usdoj.gov
        203-821-3700
        Federal Bar No. phv07156

## **CERTIFICATE OF SERVICE**

  I hereby certify that on September 19, 2017, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Avi Perry

AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY